VOGEL, Judge,
(dissenting).
Because I agree with the district court’s decision to terminate Thomas’s parental rights to M.S., I dissent from the majority opinion. I conclude the State offered sufficient evidence to prove the child could not be returned to Thomas’s care at the time of the termination hearing due to his failure to abstain from controlled substances coupled with his history of anger management problems.
M.S., the child at issue, came to the attention of the Iowa Department of Human Services (DHS) when he tested positive for THC at birth in June of 2015. While the mother initially informed the DHS that another man was the father of the child, Thomas knew of his status as the child’s father during the early stages of the pregnancy and contacted the mother a few days before M.S.’s birth, asking to see the child. Thomas was aware of the DHS’s involvement with M.S. but did not reach out to the DHS until he was contacted by letter in November 2015. When Thomas was first identified as M.S.’s father, M.S. could not be placed with him without the risk of suffering adjudicatory harm. Thomas was told he needed to remove the risk factors before he could move forward with unsupervised visitation and eventual placement of the child in his care. Those expectations included: Thomas abstaining from using drugs, complying with random drug testing, working on his *688 life stressors, and following through on individual counseling and recommendations. The goal was for M.S. to “live in a safe and stable environment, free from illegal substances, with caretakers who are clean, sober and maintaining the stability of their mental health.”
I. Marijuana Use.
From the initial conversations between the DHS and Thomas in December 2015, even before his paternity of M.S. was confirmed by the DHS, Thomas was aware of his need to provide two clean drug screens in order to move beyond fully supervised visitation with M.S. As of the time of the termination hearing in May 2016, he had utterly failed to comply with this directive. Thomas was open about his long-time use of cannabis, including marijuana and cannabis oils. He testified he began using controlled substances when he was twelve, stopped using them only while in a juvenile residential treatment facility, and admitted to daily use of marijuana after that stay. He has tried and failed three times in the past to complete drug treatment programs. He also admitted using at least three times during the course of the child-in-need-of-assistance proceeding.
While Thomas appeared to be honest and open about his marijuana use, the drug screen test results belie Thomas’s contention that he had reduced his marijuana consumption from daily usage when this case started to only the occasional use. Thomas’s hair stat test in December 2015 was “probably one of the highest the Department has seen for marijuana” at 17.63 pg/mg. The screening cut-off for a posi-five test is 1.0 pg/mg. In February, two months after the first test and after being informed of the steps necessary for him to gain custody of M.S., Thomas’s test results were almost as high as it had been in late December: 17.02 pg/mg. Despite this startlingly high result, Thomas claimed to have only used once in those two months after a stressful family team meeting in mid-January. The hair stat test on May 5 showed a reduced, but still very high, level of 11.39 pg/mg, in spite of Thomas’s claim that the last time he used was a month earlier on April 6.
The urine analysis test results also do not show a decrease in usage over the course of these proceedings.[4] A test given on April 26 showed a level of THC of 113. A test given two weeks later on May 10 showed a level of THC of 244. The screening cutoff for these tests is 50. Thomas had no explanation as to why the level would increase so dramatically in two weeks when he claimed he last used on April 6. His only explanation was his admission that he used a “detox kit” before the April 26 test. Thomas admitted he used the kit to “essentially mask whether or not THC [was] in [his] system.” Even Thomas admitted he had not made any substantial progress towards sustained sobriety in the five months he had been involved in services.
II. Life Stressors.
Of particular concern is Thomas’s concession that he uses marijuana to help cope with stress. He admitted using marijuana following a confrontational family *689 team meeting in January. He admitted using marijuana in March when his mother kicked him out of her house because of a fight they were having. He also admitted using marijuana on April 6 after learning of the murder of a. good friend.
The DHS worker remained concerned that raising a child is a stressful endeavor and that if Thomas became stressed he may turn to his coping mechanism—marijuana-while caring for M.S. and when not under the watchful eye of the DHS representative. As noted by the DHS worker, Thomas “has a lengthy history with the substance, and it is an illegal, mind-altering substance.” And while the DHS. worker had not seen him use drugs during a supervised visit, all she and this court can glean from this record is Thomas’s continued use based on the positive drug tests.
III. Anger Management.
Besides the continued marijuana use, DHS also had concerns about Thomas’s anger management. As mentioned above, at the termination hearing, Thomas admitted to escalating an interaction at a family team meeting in January. After which he admitted using marijuana to help him cope with the stress. In February, the DHS worker arrived at Thomas’s mother’s house with M.S. for a supervised visit. Thomas had not been informed of the visit due to a miscommunieation and had to be awakened to exercise his visitation. With the child present, Thomas let his frustration and anger at the miscommunieation be known to all present. The DHS worker testified Thomas was “very frustrated,” “very agitated,” and “became very argumentative and defensive.” It was “pretty hard to be able to calm him down.” Thomas’s family had to assist for thirty to forty-five minutes to try to calm him down. The DHS worker made it clear that if Thomas would not calm down, she would end the visit with M.S. “because it was not an appropriate environment for [the child] to be in with [the] father that upset.”
A month later in the middle of March, Thomas’s mother kicked him out of her house due to a conflict between the two, resulting in Thomas having to live on friends’ couches for a month before he was able to obtain housing for himself. Again, due to the stress with his mother, Thomas admitted he used marijuana to cope with the situation. Thomas’s anger problems long predate M.S.’s birth. For example, just one year before M.S.’s birth, Thomas was arrested and spent forty days in jail as a result of a physical altercation with his father. He admitted at the time of the fight, he was consuming alcohol. Thomas’s mother related to the DHS that Thomas “has always had anger issues and can go from 0 to 90 in a matter of seconds when provoked.” Thomas agreed with his mother’s assessment.
YI. Analysis.
A. Statutory Grounds for Termination. While Thomas was participating in anger-management counseling at the time of the termination hearing and was making some progress, Thomas’s pattern throughout this case has been to lash out in anger and frustration when conditions are placed on him. To cope, he turns to marijuana use. Thomas did comply in part with the DHS case plan by maintaining employment and providing adequate housing, even after he was kicked out of his. mother’s house. ■ But despite this minimal progress, I would find termination is appropriate pursuant to section 232.116(l)(h), which requires, in part, the State to produce “clear and convincing evidence that the child cannot be returned to the custody of the child’s parents as provided in section 232.102 at the present time.” Iowa Code § 232.116(l)(h)(4). “[A] *690 child cannot be returned to the custody of the child’s parent under section 232.102 if by doing so the child would be exposed to any harm amounting to a new child in need of assistance adjudication.” In re M.M., 483 N.W.2d 812, 814 (Iowa 1992).
The time for determining whether a child can be returned to a parent’s custody is the time of the termination hearing. See In re M.W., 876 N.W.2d 212, 223-24 (Iowa 2016) (“Finally, there is clear and convincing evidence in the record that at the time of the termination hearing, the children could not be safely returned to the custody of ft.W.... Upon our de novo review, we conclude that there is clear and convincing evidence in the record that the children could not safely be returned to the custody of R.W. under Iowa Code section 232.102 at the time of the termination hearing.” (emphasis added)). As noted, Thomas admitted there had not been “any substantial progress towards sustained sobriety” and admitted the child could not be “fully returned to him today.” He conceded he would require “some unsupervised and overnight visits first,” a request the DHS employee did not recall him making at earlier stages of the proceedings. It was clear to the DHS that M.S. could not be returned to Thomas’s custody at the time. M.S. has never been in Thomas’s custody since birth and has never been cared for by Thomas in an unsupervised setting. Despite five months of services, Thomas has been unable to progress beyond supervised visitation with M.S. due to his continued use of marijuana and cannabis oil. His attempts to address his anger problems remain a work in progress. While the DHS casework did not have safety concerns during Thomas’s supervised visitation, there has never been a time when his care of M.S. has not been fully supervised by the DHS. Thomas himself testified the child could not be returned to his care at the present time. M.S. is just as likely to suffer an adjudicatory harm at the time of the termination hearing as he would have been if he had been placed in Thomas’s care the moment DHS became aware of his paternity.
This is not a case where another relative has offered to assist an addicted parent unable to care for the child. Cf In re J.S., 846 N.W.2d 36, 42 (Iowa 2014). Thomas continues to claim he has abstained from marijuana use in the face of test results that tell a very different story. He has not shown he could provide a drug-free home for M.S.; he has no plan in place for M.S. to be eared for when he is using marijuana; he has no plan in place for handling stress, including the stress of caring for a very young child, other than turning to his standard coping mechanism, his drug of choice—marijuana. See id. (noting the children at issue had a grandparent who was willing and able to step in and relieve the drug-addicted mother of her parenting duties when the mother “was not up to the task”).
After five months of services, Thomas has only made minimal progress, leaving this child imminently likely to suffer adjudicatory harm if returned to this parent’s care. See Iowa Code § 232.2(6)(c)(2), (n), (o)-, see also id. § 232.116(2) (requiring consideration of child’s safety and physical, mental, and emotional condition and needs). “Child protection statutes ‘are designed to prevent probable harm to the child and do not require delay until after harm has occurred.’ ” J.S., 846 N.W.2d at 43 (quoting In re L.L., 459 N.W.2d 489, 494 (Iowa 1990)). Moreover, as is repeatedly cited in our case law, Thomas has chosen to put his needs ahead of this child’s needs. In re J.L.W., 570 N.W.2d 778, 781 (Iowa Ct.App.1997) (“At some point, the rights and needs of the child rise above the rights and needs of the parents.”), overruled on other grounds by In *691 re P.L., 778 N.W.2d 38 (Iowa 2010). By refusing to provide two clean drug-tests, Thomas has continued to demonstrate his drug use is more important than-providing a drug-free environment for his child. This, coupled with his ongoing anger management, continues to paint a picture where M.S. would be at risk of adjudicatory harm if placed in his care. “Where the parent has been unable to rise above the addiction and experience sustained sobriety in a noncustodial setting, and establish the essential support system to maintain sobriety, there is little hope of success in parenting.” In re N.F., 579 N.W.2d 338, 341 (Iowa Ct.App.1998).
B. Six-Month Extension. Thomas, admitting the child cannot be in his care at the present time, requests a six-month extension of time to work toward reunification. See Iowa Code § 232.104(2)(b). To grant such an extension, the court must be able to enumerate specific factors or expected behavioral changes that show the need for removal will no longer exist at the end of the additional six months. Id. A three-month extension was already granted to Thomas, and I agree with the district court an additional extension is not warranted here. What progress Thomas has made has been tentative at best and does not indicate the need for removal will no longer exist in six months. See In re A.AG., 708 N.W.2d 85, 92 (Iowa Ct.App. 2005).
C. Impediments to Termination and Best Interests. Thomas also contends his rights should not be terminated because of the closeness of the parent-child relationship. See Iowa Code § 232.116(3)(c). The statutory factors weighing against termination are permissive, not mandatory. In re D.S., 806 N.W.2d 458, 474-75 (Iowa Ct.App.2011). The court has discretion, based on the unique circumstances of each case and the best interests of the child, to apply the factors in section 232.116(3) to save the parent-child relationship. In re AM., 843 N.W.2d 100, 113 (Iowa 2014).
Under the circumstances, I conclude the permissive exception cannot serve to preclude termination. Thomas knew he was this child’s father when the mother became pregnant. Thomas took no action to become involved in the child’s life until the DHS contacted him. Since then, Thomas’s only interactions with this young child have been supervised visits of brief duration, and he had not even requested his supervised visitations be increased or asked the DHS to progress beyond supervised visitation as of the time of the termination hearing. Moreover, my consideration of this child’s best interests militates against invoking this permissive exception. See Iowa Code § 232.116(2). The child is not placed in foster care but placed in the maternal grandparents’ home, who have expressed a desire and willingness to adopt M.S. I would affirm the termination of Thomas’s parental rights.
VAITHESWARAN and BOWER, JJ. join this dissent.

. The record in this case indicates Thomas had positive urine drug screens on February 18, March 23, April 26, April 27, and May 10. The only negative test came on February 14, but the DHS worker indicated she doubted the accuracy of that negative test in light of Thomas's admissions as to when he last used and the positive test result that occurred four days later. The test result for March 23 indicated a level of THC above 500; the test on April 26 indicated a level of 113; the test the next day on April 27 indicated a level of 306; and the test on May 10 indicated a level of 244.